UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

BRANDI SCHULTZ,

                Plaintiff,

      v.

LEWIS & CLARK COLLEGE, an Oregon
domestic non-profit entity,

                Defendant.

Case No. 3:22-cv-00355-YY

OPINION AND ORDER

YOU, Magistrate Judge.

Plaintiff Brandi Schultz brings this action against defendant Lewis & Clark College ("L&C") alleging breach of contract and violations of Title III of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act. Plaintiff's complaint arises from events that occurred while she was enrolled as a graduate student in defendant's Master of Arts in Art Therapy degree program. Defendant has filed a motion for summary judgment against all claims. ECF 25. For the reasons set forth below, defendant's motion is granted in part and denied in part.

**I.    Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." The party seeking summary judgment bears the initial

burden of showing the absence of a genuine issue of material fact by citing to the record,

including "the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving

party must then "go beyond the pleadings" and identify in the evidentiary record "specific facts

showing that there is a genuine issue for trial." *Id.* at 324.

Only disputes over facts that are outcome determinative preclude the entry of summary

judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Furthermore, the dispute

must be genuine, "such that a reasonable jury could return a verdict for the nonmoving party."

*Id.* Where the nonmoving party offers only a "scintilla of evidence" or evidence that is "merely

colorable" or "not significantly probative," summary judgment may be granted. *Id.* at 249, 252.

There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for

that party." *Id.* at 249.

At summary judgment, the court "does not weigh the evidence or determine the truth of

the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City,

Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999). The evidence of the nonmovant must be believed,

and all rational and reasonable inferences are drawn in the nonmoving party's favor. *United

Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989).

## II.    ADA Claim

Plaintiff claims that defendant failed to accommodate her disability in violation of the

ADA, resulting in emotional distress and the loss of a graduate education. Am. Compl. ¶ 36,

ECF 5. The ADA permits only injunctive relief. *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631

F.3d 939, 946 (9th Cir. 2011) (citing 42 U.S.C. § 12188(a)(1)).  Thus, to the extent plaintiff

seeks damages, her ADA claim must be denied.

With respect to injunctive relief, plaintiff seeks an injunction requiring defendant to adopt

policies relating to disability accommodations—specifically, "policies mandating professors

implement approved accommodations and mandating training of every individual who teaches at

L&C on providing and implementing approved accommodations."  Am. Compl. ¶ 36, ECF 5.

Before reaching the merits, the court must determine whether plaintiff has standing to assert such

a claim.  *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1081 (9th Cir. 2004) ("[T]hose

who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement

imposed by Article III of the Constitution by alleging an actual case or controversy.").

To obtain injunctive relief, a plaintiff must demonstrate "a sufficient likelihood that [the

plaintiff] will again be wronged in a similar way."  *Id.* (quoting *City of Los Angeles v. Lyons*, 461

U.S. 95, 111 (1983)).  In other words, the plaintiff must show a "real and immediate threat of

repeated injury."  *Id.* (quoting *O'Shea v. Littleton,* 414 U.S. 488, 496 (1974)).  The Ninth Circuit

has repeatedly held that a former student "no longer has a live case or controversy justifying

declaratory and injunctive relief against a school's action or policy."  *Cole v. Oroville Union*

*High Sch. Dist.*, 228 F.3d 1092, 1098 (9th Cir. 2000); *Rogers v. W. Univ. of Health Sciences*, 787

F. App'x 932, 934 (9th Cir. 2019) ("The district court correctly concluded that Rogers's claim

under the Americans with Disabilities Act (ADA) is moot because she does not intend to return

to school at Western.").

The Ninth Circuit considered a similar claim in *Bird v. Lewis & Clark College*, 303 F.3d

1015 (9th Cir. 2002).  There, the plaintiff brought a discrimination claim against her former

college, seeking an order requiring the defendant to modify its overseas program to prevent

future discrimination.  *Id.* at 1019.  The court held that the plaintiff lacked standing to obtain this relief because she had graduated from the college and had not alleged plans to return as a student or participate again in the overseas program.  *Id.* at 1020.

Similarly, here. plaintiff has not alleged an intent to reenroll in defendant's graduate program.  Indeed, plaintiff has been completing an art therapy graduate program at another institution, and when asked at her deposition about reenrolling in defendant's program, plaintiff unequivocally denied an intention to return.  Morgan Decl., Ex. 1 ("Schultz Dep.") at 196:14-197:5, ECF 26-1 (describing current enrollment in another art therapy program); *id.* at 240:1-4 ("Q: You're not asking to go back to Lewis & Clark, I'm assuming, at this point." A: Yes. Correct.").  In her responsive brief, plaintiff stated that she "has expressed an unwillingness to return, but the opportunity to return is not foreclosed."  Resp. 26, ECF 33.  At the hearing on the motion for summary judgment, plaintiff's counsel similarly represented that plaintiff may return to L&C for further study.  But these vague representations, devoid of any anticipated timeline, are insufficient to show a likelihood of imminent future harm.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) ("'[S]ome day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require.").

Plaintiff cites a line of cases concerning public accommodations that hold "a disabled individual who is currently deterred from patronizing a public accommodation due to a defendant's failure to comply with the ADA has suffered 'actual injury.'"  *Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1138 (9th Cir. 2002).  Plaintiff asserts that because defendant is a public accommodation as defined in the ADA, she can demonstrate standing by showing that she is deterred from future enrollment.  Resp. 26, ECF 33.

These cases do not save plaintiff's claim.  Contrary to plaintiff's assertion, *Pickern* and its progeny have not done away with the requirement that an ADA claimant must demonstrate an intent to return to the allegedly infringing establishment.  *Pickern*, 293 F.3d at 1138 ("Doran also states that he prefers to shop at Holiday markets and that he would shop at the Paradise market if it were accessible. This is sufficient to establish actual or imminent injury for purposes of standing."); *see also D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1037 (9th Cir. 2008) ("[W]e have found actual or imminent injury sufficient to establish standing where a plaintiff demonstrates an intent to return to the geographic area where the accommodation is located and a desire to visit the accommodation if it were made accessible."); *C.R. Educ. & Enf't Ctr. v. Hosp. Properties Tr.*, 867 F.3d 1093, 1099 (9th Cir. 2017) ("[T]heir intent to visit the hotels once they provide equivalent shuttle service for the disabled renders their harm 'actual or imminent, not conjectural or hypothetical.') (citing *Lujan*, 504 U.S. at 560).  And, as discussed above, the Ninth Circuit has applied this analysis to schools.  *Cole*, 228 F.3d at 1098 ("It is well-settled that once a student graduates, he no longer has a live case or controversy justifying declaratory and injunctive relief against a school's action or policy."); *Rogers v. W. Univ. of Health Scis.*, 787 F. App'x 932, 934 (9th Cir. 2019) ("The district court correctly concluded that Rogers's claim under the Americans with Disabilities Act (ADA) is moot because she does not intend to return to school at Western.").

In sum, because plaintiff has not shown an intention to return to L&C, she lacks standing to assert an ADA claim and the claim must be dismissed.

## III.    Rehabilitation Act Claim

In contrast to an ADA claim, a plaintiff may be awarded damages under the Rehabilitation Act, and the standing analysis above does not apply to claims for damages.  *Cole*,

228 F.3d at 1099 ("Although a student's graduation moots his claims for declaratory and injunctive relief against school officials, it does not moot his damage claims."); *see also Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 798 (9th Cir. 1999) ("A student's graduation moots claims for declaratory and injunctive relief, but it does not moot claims for monetary damages.").

Plaintiff alleges that defendant violated Section 504 of the Rehabilitation Act by failing to accommodate her disability. Section 504 provides in relevant part:

> No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).

To prevail on a Rehabilitation Act claim, plaintiff must show that "[s]he is an individual with a disability, [s]he is otherwise qualified to receive the benefit; [s]he was denied the benefits of the program solely by reason of [her] disability; and the program receives federal financial assistance." *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001). To obtain monetary damages, plaintiff must additionally prove defendant acted with "intentional discrimination," which may be satisfied through a showing of "deliberate indifference." *Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir. 2008).

The Ninth Circuit evaluates failure to accommodate claims against educational institutions under the burden-shifting framework articulated in *Zukle v. Regents of Univ. of California*, 166 F.3d 1041 (9th Cir. 1999). *See, e.g.*, *Wong v. Regents of Univ. of California*, 192 F.3d 807, 816 (9th Cir. 1999), *as amended* (Nov. 19, 1999) (applying *Zukle*); *E.R.K. ex rel. R.K. v. Hawaii Dep't of Educ.*, 728 F.3d 982, 992 (9th Cir. 2013) (same). Under this framework, plaintiff bears the initial burden of proving that she is "otherwise qualified" and that a reasonable

accommodation would have enabled her to meet the educational institution's essential eligibility requirements. *Zukle*, 166 F.3d at 1047. If plaintiff carries her burden, the onus shifts to defendant to show that the requested accommodation would require a "fundamental or substantial modification of its program or standards." *Id.* The ultimate burden remains with plaintiff to show that she could meet the school's program requirements with reasonable accommodations. *Id.*

Plaintiff asserts that she met the Art Therapy program's essential eligibility requirements because her overall grade point average at the time of her dismissal exceeded the graduate school's minimum requirement. Pl. Supp. Brief 3, ECF 43. Furthermore, plaintiff points to her grades as evidence that she was able to pass her courses when defendant provided her with her approved accommodations. *Id.* at 4. Plaintiff contends that her grades demonstrate that she could have passed the program's required candidacy course, AT 570, if defendant had provided accommodations for that course. *Id.*

Defendant asserts that plaintiff's grade point average at the time of her dismissal does not satisfy the essential eligibility requirements of the Art Therapy program. Def. Supp. Brief 4, ECF 44. Furthermore, in response to plaintiff's argument that she could have passed AT 570 if she had received the agreed-upon accommodations, defendant contends that plaintiff has not identified instances where defendant failed to provide accommodations. *Id.*

As noted, plaintiff bears the initial burden of showing that she can meet the essential eligibility requirements of the Art Therapy program. Contrary to plaintiff's assertion, her overall grade point average of 3.167 and passing grades in most of her classes do not satisfy her burden to show that she was "otherwise qualified" because those indices alone are not sufficient to maintain enrollment in the Art Therapy program. Plaintiff's Art Therapy program instructors

cited two reasons for plaintiff's dismissal: plaintiff's lack of "satisfactory academic progress" and her failure to pass a required class, AT 570. Bella Decl. ¶ 3, ECF 28; Andrus Decl. ¶ 7, ECF 29; Morgan Decl., Ex. 1 at 85–86, ECF 26-1. The "Satisfactory Academic Progress and Performance Policy" is set out in the L&C student catalogue. Morgan Decl., Ex. 2 at 35, ECF 26-2; *id.* Ex. 1 ("Andrus Dep.") at 45:19-25, ECF 26-1 (summarizing policy). While the policy provides that students "must maintain a B average (3.0)," it also states that "[a]ny student receiving . . . two course grades lower than a B- will not be considered to be making satisfactory progress." *Id.*, Ex. 2 at 35, ECF 26-2. According to the policy, "[s]tudents who do not meet the standards for satisfactory academic progress will be immediately withdrawn from their programs and notified of this action.[1] *Id.*

In her first semester at L&C, the fall of 2018, plaintiff obtained one "C" and had an overall GPA of 2.822. Morgan Decl., Ex. 1 at 78, ECF 26-1. The following semester, plaintiff obtained one "C+" with an overall GPA of 2.867. *Id.* Then, in the 2020 spring semester, plaintiff obtained one "C+" and one "C-."[2] *Id.* Plaintiff received these "C" letter grades in

---

[1] Teresa McDowell, Chair of the Department of Counseling Psychology, which encompasses the Art Therapy program, elaborated on the rationale behind this requirement in her deposition:

> You have to pass all the courses, and the rationale behind that in professional education is somewhat different than an undergraduate education or an education where you're not working with the public, and the reason for that is if you don't master the content of a course, every course . . . it's information you have to have to practice ethically and competently. . . . so that's a pretty big concern when you get into professional education that you're not comprehending what's absolutely required of you to work with the public.

Morgan Decl., Ex. 5 ("McDowell Dep.") at 31:9-24, ECF 26-5.

[2] Defendant explains that plaintiff should have been automatically terminated from the Art Therapy program after receiving her spring 2019 grades, in which she received her second grade

classes that were required for completion of the Art Therapy program.  Andrus Decl., Ex. 2, ECF 29-2.  Thus, pursuant to the satisfactory academic progress policy, plaintiff did not earn the grades necessary to remain enrolled in the Art Therapy program.  Plaintiff's grades alone do not, therefore, satisfy her burden to show that she satisfied the essential eligibility requirements of the program.

Plaintiff cursorily asserts that the satisfactory academic progress policy "'disguise[d] truly discriminatory requirements' via its selective enforcement," but does not provide sufficient evidence to find that the policy is discriminatory in nature or in application.  Pl. Supp. Brief 4, ECF 43.  Plaintiff cites to deposition testimony wherein Mary Andrus, one of plaintiff's Art Therapy professors, explains that faculty have discretion in allowing students the opportunity to retake classes to increase their grades.  Andrus Dep. 46:21-47:9, ECF 35-2.  Plaintiff further alleges that Art Therapy instructors have previously permitted students to retake classes but did not extend plaintiff that opportunity.  Resp. 14, ECF 33.  Those facts alone do not provide a basis to find discriminatory effect or intent.  In the absence of information about those students who were permitted to retake classes, there is no basis upon which to find that defendant permitted students without disabilities to retake classes while denying students with disabilities that same opportunity.

---

"below a B-," but a technical error by the registrar's office permitted plaintiff to register for classes the following semester.  McDowell Dep. 49:1-22, ECF 26-5; Morgan Decl., Ex. 5 at 20–22, ECF 26-5 (email exchange between McDowell and registrar's office regarding plaintiff's grades).  After detecting this error, the registrar's office noted that "internal reports and documentation have all been updated, with procedures to better identify and review these students."  Morgan Decl., Ex. 5 at 20, ECF 26-5.  These facts do not alter the conclusion that, at the time of her dismissal, plaintiff did not have grades that satisfied the Art Therapy program's academic requirements.

Additionally, plaintiff has not shown that she could have passed AT 570 with reasonable accommodations. Art Therapy faculty members characterized this class as "pivotal" and demonstrative of whether a student met the "academic requirements and/or the skills and comprehension requirements" necessary to start seeing clients. Andrus Dep. 131:15-25, ECF 26-2; Morgan Decl., Ex. 2 at 52, ECF 26-2. The Art Therapy course catalogue describes AT 570 as a "[c]omprehensive evaluation of the student's level of clinical understanding of theory and art therapy practice in preparation for internship placement." Andrus Decl., Ex. 2 at 4, ECF 29-2; *see also* Morgan Decl., Ex. 2 at 36, ECF 26-2 (AT 570 course syllabus). In a letter to plaintiff, Art Therapy faculty quoted the following passage from the Art Therapy student handbook:

> The advancement to candidacy process includes a comprehensive assessment and formal presentation as well as a review of academic and supervised field work. Each student's work is evaluated by a faculty committee comprising core and adjunct faculty members. As a result of this review students may be:
> - Advanced to internship
> - Placed on probationary status, Note: Students who are placed on probationary status will be required to demonstrate improvement during the next term as required by the candidacy committee.
> - Required to discontinue graduate study in the MA program.

Morgan Decl., Ex. 2 at 50, ECF 26-2.

Art Therapy faculty cited plaintiff's "C-" in AT 570 as indicative of an insufficient grasp of course material that was prohibitive to advancing in the program and seeing clients. Andrus Dep. 126:21-127:4, ECF 26-2; Morgan Decl., Ex. 5 ("McDowell Dep.") at 68:23-69:6, ECF 26-5. Additionally, plaintiff's professor for AT 570, Mary Andrus, stated that plaintiff "did not reach out for clarification on her paper or video with enough time to ask questions or complete the assignment accurately"—those two assignments comprised 40% of the grade in that class. Morgan Decl., Ex. 5 at 13, ECF 26-5; Andrus Decl., Ex. 3, ECF 29-3 (AT 570 course syllabus).

Plaintiff asserts that her grade in AT 570 was attributable to defendant's failure to give her approved accommodations.  Resp. 15, ECF 33; Pl. Supp. Brief 4, ECF 43.  Plaintiff alleges that defendant failed to provide alternative versions of texts, note takers, and extensions on assignments.  Resp. 23, ECF 33.  But plaintiff has not identified evidence that shows defendant failed to provide these accommodations in the context of AT 570 or otherwise.  Taking each of the accommodations in turn:

First, plaintiff received an accommodation for "Alternative Text: recorded or electronic format (facilitated by Student Support Services)."  Morgan Decl., Ex. 1 at 44, 47, ECF 26-1.  Plaintiff does not dispute that defendant assisted her in installing Kurzweil 3000, an electronic text software, to "assist with e-texts."  Schultz Dep. 66:1-67:6, ECF 26-1; Morgan Decl., Ex. 1 at 46, ECF 26-1; Brague Decl., Ex. 1 ("Schultz Dep.") at 69:19-20, ECF 35-1.  Additionally, in a September 26, 2018 email, Eileen Dowty, the Associate Director for Student Support Services, instructed plaintiff on how to access this accommodation.  Morgan Decl., Ex. 1 at 45, ECF 26-1.  To obtain electronic versions of textbooks, plaintiff was instructed to submit an online "request form for EText" and "prioritize the books you are requesting, so that Rebecca can get to them in the order they will be needed."  *Id.*  In other words, defendant instructed plaintiff to provide Student Support Services with a list of course materials so that staff could procure the required textbooks.[3]  Plaintiff testified that she used the program if her "book was available."  Schultz Dep. 66:8-9, ECF 26-1.  However, it was incumbent on plaintiff to request her books from defendant.  Plaintiff has not shown that she contacted Student Support Services to request electronic texts, or that defendant failed to provide recorded or electronic versions of textbooks

---

[3] Andrus also testified "student support services works to provide alternative texts for students who might need it."  Andrus Dep. 57:4-6, ECF 35-2.

that she requested.[4]  Given these facts, it cannot be said that defendant failed to provide this accommodation.

Plaintiff also received an accommodation for "Note takers (facilitated by Student Support Services)."  Morgan Decl., Ex. 1 at 47, ECF 26-1.  Like electronic textbooks, peer note takers could be requested through Student Support Services.  *Id.* at 45.  In the same September 26, 2018 email from Student Support Services discussed above, the Associate Director informed plaintiff that she could "request note takers" through the Student Support Services webpage.  *Id.*  Plaintiff described that her Art Therapy "cohort was pretty small"—"it was "the first one"—and there was no peer note taker until "maybe later, . . . later in the program."  Morgan Supp. Decl., Ex. 1 ("Schultz Dep.") at 71:15-72:24, ECF 37-1.  When asked at her deposition whether she had received assistance from a peer note taker, plaintiff testified, "I don't believe so. . . [M]aybe one semester, but I don't believe I had any support through note taking at that point . . . at Lewis & Clark."  *Id.* at 72:17-73:2.  However, when asked whether she had ever requested a note taker through Student Support Services, she testified, "I cannot remember," and "I would have assumed that I would have reached out for support . . . , but at the same time, electronics were – they were not my – this wasn't – this isn't my strength right here."  *Id.* at 73:8-20.  Plaintiff's equivocal statements, without more, are insufficient to create a triable question of fact as to whether she requested a note taker through Student Support Services.  *See Olvera v. Cnty. of*

---

[4] Plaintiff testified that she was unable to purchase electronic versions of her course materials. Schultz Dep. 69:5-12, ECF 35-1 ("Q: . . . when you purchased your books, and this may have changed over time, but did you purchase, like, hard copies of the books or were they electronic form? A: No, hard copies. Q: Okay. Was there electronic format – formats of those books available to be purchased? A: Not all of them.").  But this is not the accommodation that defendant agreed to provide.  *See* Morgan Decl., Ex. 1 at 45, ECF 26-1 (approving plaintiff's accommodation for "Alternative Text: recorded or electronic (facilitated by Student Support Services)").  Plaintiff's inability to independently purchase electronic books does not bear on whether defendant satisfied its obligation to provide alternative texts.

*Sacramento*, 932 F. Supp. 2d 1123, 1150 (E.D. Cal. 2013) (finding that the plaintiff's testimony

that she was "not sure" about the identity of an individual was insufficient to create a genuine

issue of material fact); *Bond v. Knoll*, No. EDCV 11-1929 PSG JC, 2014 WL 7076901, at *8

(C.D. Cal. Dec. 10, 2014) (deposition testimony and unsworn assertion that plaintiff "thought" or

"believe[d]" he spoke to an officer on a particular date were insufficient to create a triable issue

of fact).

Additionally, defendant has shown that on September 3, 2019, it informed plaintiff of a

"new note-taking service" that it was offering students.  Schultz Dep. 70:2-11, ECF 37-1.  The

service, a software called Sonocent, allowed students to "record lectures on a laptop or mobile

device, color highlight information, import presentation slides or diagrams next to the audio files,

and also include text notes."  *Id*. at 70:12-17.  Defendant provided plaintiff with the "opportunity

to utilize" that service or traditional peer note takers by selecting the option on the "note taker

request form."  *Id.* at 70:21-25.  Plaintiff testified that she did not request this software on her

computer or otherwise use it.  *Id.* at 71:9-11 ("Q: Okay. Do you recall ever using Sonocent as a

note-taking software? A: No, sir."); *id.* at 74:6-8 ("Q: You did not request to have Sonocent

installed on your computer." A: No.").

In sum, plaintiff has not identified evidence showing that defendant denied her request

for a note taker.  Moreover, defendant provided an alternate means by which plaintiff could

obtain note-taking assistance, and plaintiff has not proffered any evidence that she was denied

access to this service, or that this service was an inadequate accommodation.  Therefore, plaintiff

has not shown that defendant failed to provide note takers.

Finally, plaintiff received an accommodation for "Exams: Time and a half on exams."[5]
Morgan Decl., Ex. 1 at 47, ECF 26-1.  Plaintiff claims that this accommodation also included
providing her additional time on papers and other assignments.  In the September 26, 2018 email,
the Associate Director of Student Support Services stated, "I encourage you to meet individually
with [your professors] and discuss how accommodations may apply."  *Id.* at 45.  The record is
absent of evidence showing that plaintiff met with her professors to establish how her
accommodations would be applied in her classes, as she was encouraged to do.  The record is
replete, however, with instances where plaintiff requested, and received, extensions on
assignments at the eleventh hour.  *See, e.g.*, Morgan Decl., Ex. 1 at 87, ECF 26-1 (extension on
paper); *id.* at 89 (extension on paper); *id.* at 94 (extension on paper); *id.* at 95 (extension on
assignment); *id.* at 97 (extension on paper); *id.* at 98 (extension on paper); *id.* at 100 (extension
on paper); *id.* at 101 (further extension); *id.* at 103 (paper resubmission); *id.* at 105 (extension on
assignment).  Plaintiff has not produced evidence that defendant denied an extension request,
except for perhaps one instance where a professor marked down plaintiff's assignment grade for
tardiness and informed plaintiff that she had not provided "enough notice" of the need for an
extension.  Brague Decl., Ex. 5 at 20, ECF 35-5.

In any event, the accommodations that the parties had agreed upon did not include
extensions on assignments, including papers.  Morgan Decl., Ex. 1 at 44, ECF 26-1.  The
Accommodations Agreement Form, which plaintiff signed on September 26, 2018, lists only
"[e]xtended time on exams (time and a half)."  *Id.*  It says nothing about extensions on
assignments.  This accommodation was specifically listed in defendant's October 18, 2018 letter

---

[5] Plaintiff also received an accommodation for "Exams: Reduced-distraction testing space,"
Morgan Decl., Ex. 1 at 48, ECF 26-1, but plaintiff does not argue that defendant failed to provide
this accommodation.  Resp. 12, ECF 33.

to plaintiff, and again contains no mention of extensions on assignments.  Morgan Decl., Ex. 1 at

47, ECF 26-1.  Although plaintiff asserts that her accommodation for "exams" extended to

assignments, the record reflects that extensions for assignments is a separate type of

accommodation.  *See* Brague Decl., Ex. 4 ("Holzwarth Dep.") at 14:16-15:2, ECF 35-4 ("Q:

[G]enerally in your experience, what kind of accommodations have you seen students received?

A: It varies in my – in my classes, I do get copies of – I'm copied sometimes on the

accommodation letters as director of the writing center, but what I tend to see is flexibility on

assignment deadlines, extra time on exams, sometimes flexibility about attendance policy,

sometimes requests for a note-taker in class. Those are probably the most common ones that I

see."); Andrus Dep. 57:20-25, ECF 35-2 ("Q: So if there were papers, would the exam

accommodation apply for giving extra time for papers to be turned in? A: That would be between

the student and the faculty member to come up with a workable accommodation that would meet

their needs."); *id.* at 37:15-20 ("Q: Have you had experience with students receiving

accommodations like extra time on tests? A: Yes. Q: And have you had students that have

received extra time for turning in assignments? A: Yes.").

        Also, contrary to plaintiff's contention, there is otherwise no evidence that plaintiff's AT

570 professor, Mary Andrus, "intentionally failed" plaintiff from the course.  Resp. 15, ECF 33;

Pl. Supp. Brief 4, ECF 43.  Plaintiff bases her argument off the timing of events leading up to her

dismissal.  Resp. 15, ECF 33.  By March 27, 2020, Andrus had apparently drafted a letter

informing plaintiff that she would be dismissed from the program.  *Id.* (citing Brague Decl., Ex.

5 at 10, ECF 35-5).  Plaintiff contends that Andrus prematurely determined that plaintiff would

fail the course before the semester had even concluded.  Am. Compl. ¶ 18, ECF 5.

The spring 2020 semester began in mid-January and coursework concluded in mid-April. Morgan Decl., Ex. 2 at 36, ECF 26-2 (course syllabus).  In an email dated March 25, 2020, Andrus told Teresa McDowell, the department chair, and Kristine Bella, the clinical coordinator and an instructor, that plaintiff's "candidacy paper was not passing," "her counseling skills class video showed a lack of application of basic counseling skills, and "her video was turned in late and she did not reach out for clarification on her paper or video with enough time to ask questions or complete the assignments accurately."  Morgan Decl., Ex. 5 at 13, ECF 26-5.  As discussed above, the candidacy paper and the video constituted 40% of the grade in AT 570. Morgan Decl., Ex. 2 at 39, ECF 26-2.  Thus, it is apparent that two-thirds of the way through the semester, and after grading plaintiff's assignments comprising a significant portion of plaintiff's grade in the class, Andrus had formed an understanding of plaintiff's comprehension of course material and whether plaintiff would pass the class.  Andrus's statements convey her assessment of plaintiff's coursework based on plaintiff's performance in AT 570 and do not show an improper intent.  Even drawing all reasonable inferences in plaintiff's favor, the record does not show that Andrus "intentionally failed" plaintiff because of her disability.

At the court's request, plaintiff submitted supplemental briefing to identify "the accommodations that would have permitted her to meet the requirements of the Art Therapy program."  *See* Order, ECF 42.  Plaintiff asserts that she could have met the requirements if defendant had provided the agreed-upon accommodations that it had approved for her.  Pl. Supp. Br. 3, ECF 43.  As discussed above, plaintiff has not shown that she was qualified to remain in the Art Therapy program even with those accommodations.  And, because plaintiff does not identify any additional reasonable accommodations that defendant might have offered, plaintiff's Rehabilitation Act claim fails.

IV.    **Breach of Contract Claim**

Plaintiff alleges that defendant committed a breach of contract by failing to act in

accordance with its 2018-2019 graduate catalogue and addendum, course syllabi, bulletins,

circulars, website, and regulations.  Am. Compl. ¶ 23, ECF 5.  Specifically, plaintiff asserts that

defendant breached the following language published on the website of L&C's writing center:

> Above all, [L&C Writing Center] are deeply committed to the
> belief that everyone can learn to craft clear, thoughtful, and even
> elegant prose. Please come see us, because writing skills will serve
> you far beyond Lewis & Clark, not just in your career, but in living
> a reflective life and advocating with a voice in the things that
> matter most to you.

Am. Compl. ¶ 12, ECF 5, and this statement published in defendant's graduate catalogue:

> Therefore, the institution explicitly acknowledges and affirms its
> conviction that diversity with respect to race, ethnicity, national
> origin, socioeconomic background, religious orientation or
> spirituality, physical or sensory disability, gender, and sexual
> orientation on the Lewis & Clark campuses provides an
> educational benefit for all students that can be realized only by
> enhancing and preserving the presence of students and education
> professionals from diverse backgrounds within our learning
> community. In creating and sustaining such a community, we
> engage, to the extent possible, in practices that will ensure a high
> degree of diversity on our campuses, simultaneously meeting the
> highest standards of academic excellence of which we are capable.

*Id.* ¶ 14.  Plaintiff also asserts that defendant violated its nondiscrimination policy published in

its course syllabi, *id.* ¶ 16, and the terms of its letter approving plaintiff for disability

accommodations, which was marked "personal and confidential" and stated that the information

contained therein "should be considered confidential."  *Id.* ¶ 17.

Under Oregon law, it is generally accepted that the relationship between a student and a

private university, "which involves the payment of tuition for educational services, is essentially

contractual in nature."  *Vejo v. Portland Pub. Sch.*, 204 F. Supp. 3d 1149, 1175 (D. Or.

2016), *rev'd and remanded on other grounds,* 737 F. App'x 309 (9th Cir. 2018).  "[A] student

and a private university may have a contractual relationship based on the terms contained in publications that the university provides to the student." *Dauven v. George Fox Univ.*, No. CV.09-305-PK, 2010 WL 6089077, at *16 (D. Or. Dec. 3, 2010), *report and recommendation adopted*, No. 09-CV-305-PK, 2011 WL 901026 (D. Or. Mar. 15, 2011) (citing *Tate v. North Pacific College*, 70 Or. 160, 165 (1914) ("The defendant issued its catalogue, stating its requirements for graduation and for the conferring upon candidates of the degree of Doctor of Dental Medicine, and the plaintiff, with knowledge of those requirements, entered the college, matriculated and attended its sessions, with the intention of obtaining said degree. These acts on the part of the college and of the plaintiff constituted a contract.")). "[T]he enforceability of provisions in handbooks and catalogs depends on the specific facts of each case." *Vejo*, 204 F. Supp. 3d at 1175. "The relevant inquiry is whether a party's 'communications and overt acts' suggest it 'manifested assent' to be bound by a promise." *Id.* (quoting *Kabil Devs. Corp. v. Mignot*, 279 Or. 151, 157 (1977)).

For the reasons discussed at length above, plaintiff has not shown that defendant failed to accommodate her disability; therefore, plaintiff's allegations concerning failure to provide agreed accommodations and disability discrimination do not support a breach of contract claim. Additionally, plaintiff has not identified contractual language in which defendant promised to provide her with an impartial academic review panel, safeguard her from L&C employees, or prevent her from being subject to a "no-miss" attendance policy; accordingly, those allegations too do not support a breach of contract claim.

Plaintiff asserts that defendant violated its promise of confidentiality by requiring her to write and share a paper and artwork discussing her disability. Resp. 17–18, ECF 33. Plaintiff relies on defendant's nondiscrimination policy in general, but specifically points to letters that

defendant emailed to plaintiff that acknowledged plaintiff's disability and accommodations, were marked "personal and confidential," and stated that the information contained therein "should be kept confidential."  Resp. 17, ECF 33; Morgan Decl., Ex. 1 at 47–49, ECF 26-1 (capitalization omitted).

On October 21, 2019, plaintiff was referred for an Academic Review Panel ("ARP") "due to concerns related to professional qualities required of students in the Art Therapy program." Morgan Decl., Ex. 2 at 44, ECF 26-2.  On November 5, 2019, an ARP follow-up meeting was held, which plaintiff attended, along with Art Therapy faculty, including Mary Andrus.  Morgan Decl., Ex. 2 at 47, ECF 26-2.  Various issues were discussed and goals were set, including that plaintiff would seek clarification with instructors in a timely manner, sufficiently rest so as not to sleep in class, come to class prepared and organized, continue attending therapy on a regular basis, demonstrate the ability to self-regulate in class and in practicum, and present a reflection paper and art piece to her class.  Morgan Decl., Ex. 2 at 47-49, ECF 26-2; Schultz Dep. 229:19-230:3, ECF 35-1.

Plaintiff claims that, although sharing papers and art pieces was a regular part of the Art Therapy curriculum, she was the only student required to present an additional paper and artwork, and she was required to discuss her disability.  At her deposition, plaintiff testified: "[D]uring the panel process, Andrus had me write a paper about my disability and do an additional art piece at the same time, and go to the class and read about it, show the art, and explain my – what my impact has done to my peers," and "I was the only one who was doing this in the room at the time."  Schultz Dep. 229:19-231:1, 232:12–13, ECF 35-1.

Defendant maintains that "[a]t no point was [plaintiff] required to disclose or discuss her disabilities with the ARP or her classmates."  Mot. Summ. J. 30, ECF 25.  In support, defendant

proffers a declaration by Andrus who attests that plaintiff "was not required to disclose or discuss her disabilities with the Academic Review Panel" or "required to disclose or discuss her disabilities with her classmates in the Art Therapy Masters Program." Andrus Decl. ¶ 5, ECF 29. Andrus attests that plaintiff was only "asked to write a paper and craft a piece of art to help her process the recent traumatic life events she was experiencing, including her divorce and custody battle with her ex-husband, which had impacted her academic performance and her classmates." *Id.*

This competing testimony constitutes a factual dispute that cannot be resolved on summary judgment. When the evidence is viewed in the light most favorable to plaintiff, she has "present[ed] facts evincing that the college's 'communications and overt acts suggest it manifested intent to be bound by the statements . . . in its written documents,'" specifically the letters that defendant emailed to plaintiff that were marked "personal and confidential" and stated that the "information should remain confidential." *Gallagher v. Capella Educ. Co.*, No. 3:19-CV-01342-JR, 2019 WL 8333532, at *5 (D. Or. Dec. 23, 2019), *report and recommendation adopted sub nom. Gallagher v. Capella Univ. Inc.*, No. 3:19-CV-01342-JR, 2020 WL 1550729 (D. Or. Apr. 1, 2020) (quoting *Breyer v. Pac. Univ.*, 2017 WL 3429395, *4 (D. Or. Aug. 9, 2017) (citations and internal quotations omitted). To be clear, this is not to say that every letter that is sent from a college to a student is a contract. But, in this case, defendant has not shown why a personalized letter to a student containing a promise to keep information regarding her disability "private and confidential" does not constitute a contract, given the case law holding that a college may create a contract through language contained in its handbooks and catalogs.

Defendant argues that plaintiff failed to properly plead this claim because "there are no facts in the complaint about failing to maintain [her] privacy." Mot. Summ. J. 26, ECF 25. To the contrary, the complaint alleges that defendant "breached its contract" with plaintiff in several ways, including:

> f. By requiring Schultz to write a paper on her disabilities and its impact on others;
> g. By requiring Schultz to present artwork for public shaming;
> h. By failing to maintain Schultz's privacy associated with her disability[.]

Am. Compl. ¶ 24, ECF 5. Plaintiff also specifically cited to the letter in her complaint. *Id.* ¶ 17.

Defendant contends that plaintiff's claim "fails as a matter of law because a bargain for a preexisting legal duty is insufficient consideration to form a contract." Mot. Summ. J. 27, ECF 25. Defendant points to its non-discrimination policy and argues that it had "preexisting obligations" to accommodate plaintiff's disability "under the Rehabilitation Act and the ADA." *Id.* As discussed above, plaintiff's breach of contract claim is dismissed to the extent it relies on defendant's alleged failure to provide plaintiff with accommodations. But to the extent plaintiff contends that defendant breached its promise to keep her disability "private and confidential," this aspect of plaintiff's claim survives summary judgment.

Plaintiff also asserts that defendant was bound by a unilateral contract to provide her with access to L&C's writing center. Resp. 19, ECF 33. Plaintiff argues that language on the writing center website, "Please come see us," constituted an invitation, which plaintiff accepted by visiting the center. *Id.* Plaintiff's interpretation of this language is unworkable. The writing center website is hosted on L&C's college of arts and sciences website, which is accessible by the public. Holzwarth Decl. ¶ 4, ECF 27; *id.*, Ex. 1, ECF 27-1 (writing center website screenshot). No reasonable jury would understand this language to mean that defendant

undertook an obligation to serve any individual who came to the writing center for writing assistance. Thus, this language does not give rise to a breach of contract claim.

Finally, plaintiff raises, for the first time, in her response to defendant's motion for summary judgment, the claim that defendant breached a duty of good faith and fair dealing. Because this claim is premised on the assertion that defendant failed to accommodate plaintiff's disability, which fails for the reasons discussed *supra*, plaintiff has not shown that defendant violated a duty of good faith and fair dealing.

## ORDER

For the reasons discussed in this Opinion and Order, defendant's motion for summary judgment (ECF 25) is GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED.

DATED September 4, 2024.


_____/s/ Youlee Yim You_____
Youlee Yim You
United States Magistrate Judge